## GRAIN BELT BREWERIES, INC. v. COMMISSIONER OF TAXATION.

243 N. W. 2d 322.

June 18, 1976—No. 45838.

*Callinan, Raidt & Haertzen, Edward M. Callinan,* and *Thomas L. Johnson,* for relator.

*Warren Spannaus,* Attorney General, and *Kenneth E. Raschke, Jr.,* Assistant Attorney General, for respondent.

Heard before Peterson, MacLaughlin, and Scott, JJ., and considered and decided by the court en banc.

SCOTT, JUSTICE.

The taxpayer, Grain Belt Breweries, Inc., petitioned for a writ of certiorari to review an affirmance by the Tax Court of an assessment of additional income taxes by the commissioner of taxation (now commissioner of revenue). We granted certiorari and hereby affirm.

Both parties adopted the following findings of fact of the Tax Court:

"1. Appellant is a corporation organized under the laws of the State of Minnesota. Its principal office is located in Minneapolis, Minnesota. During the years in question it also operated a brewery in Omaha, Nebraska.

"2. For the years 1967, 1968 and 1969, appellant filed Minnesota income tax returns and apportioned its income by the use of the three factor formula. There is no dispute about the fact that the appellant was entitled to apportion its income by the use of the formula, but in determining the numerator of the sales factor of the formula, appellant reported only those sales made to distributors operating in Minnesota. Appellant contends that all other sales were made outside of the State of Minnesota and should not be included in the numerator.

"3. By his Order dated February 26, 1971, the Commissioner redetermined the numerator of the sales factor to include all sales processed through the Minneapolis office of the appellant.

"4. Appellant filed a timely appeal, claiming that all sales to distributors outside of the State of Minnesota were negotiated or effected by sales personnel connected with offices located outside of the State of Minnesota, except for a few sales negotiated through the Moorhead office. It is the appellant's contention that all sales to distributors outside of the State of Minnesota were assignable to the states in which the offices of the Regional Sales Managers were located.

"5. After filing the appeal appellant has conceded those additional income taxes assessed for the years in question which are based on issues other than the application of Minnesota Statutes,

Section 290.19, Subdivision 1(4) relating to apportionment of out-of-state sales. With such concession the appellant paid the additional tax but left at issue and unpaid an alleged deficiency for each of the years as follows:

| Year | Amount |
|------|--------|
| 1967 | $22,225.89 |
| 1968 | 15,924.09 |
| 1969 | 17,066.31 |
| Total at issue | 55,216.29 |

"6. From June 1, 1967, through 1969, appellant operated brewing plants at Minneapolis, Minnesota, and Omaha, Nebraska, from which it shipped beer to all the states in which appellant did business. In the Order Determining Tax Liability, the Commissioner of Taxation excluded, for purposes of appellant's Minnesota income tax, sales in those states or portions thereof, supplied from the Omaha, Nebraska plant. The Order further provided, however, that all other sales were attributable to and taxable by Minnesota on the theory that they were sales made by agents situated at, connected with, or sent out from the Minneapolis office.

"7. Appellant has conceded that from January 1, 1967, through September 1968, the net income applicable to its sales in North Dakota, South Dakota, Montana, and states west of those three, [was] taxable in Minnesota because for that period its Regional Sales Manager managed these sales from an office in his residence located at Moorhead, Minnesota.

"8. In all states, other than Minnesota, appellant sold its products exclusively to distributors who were independent contractors. These distributors in turn sold to retailers who were licensed to sell beer to consumers. All sales were made F.O.B. appellant's brewery location. Until March of 1966 the administration of sales was at appellant's principal office in Minneapolis under the Director of Sales and Marketing and the Wholesale Sales Manager. Up to said date appellant had District Sales

Supervisors working in its marketing area who reported to and were under the direction of the executives in Minneapolis.

"9.    In March of 1966, appellant nearly doubled its sales force and divided its sales territory into regions, assigning a Regional Sales Manager (Sales Manager) to each region with District Sales Supervisors (Salesmen) working under each Sales Manager. This was done to improve appellant's competitive position and to create more direct contact with distributors and retailers. This new system enabled the executives in Minneapolis and particularly the Wholesale Sales Manager, to spend more time on general policies of marketing, advertising and related activities, rather than negotiating or effecting sales.

"10.    The Sales Managers were in charge of seeking new distributors to handle appellant's products. Upon locating a prospective distributor, the Sales Manager would investigate the applicant concerning his business policies and practices and his financial condition. The application would then be forwarded to the home office for credit approval. After confirmation, the Sales Manager would assist the distributor in the preparation of his first order, which involved assisting him in the preparation of the order form and advising him of the different varieties of products available; helping him order his advertising material, advising him what would be the best packages to sell and setting out the general policies of appellant. The Sales Manager would then assign some of appellant's salesmen under his control to that distributor's territory to assist the distributor in selling appellant's products to the retail accounts. The Sales Manager would also assist in the training and motivation of the distributor's sales personnel.

"11.    The Sales Manager was directly responsible for all sales within his region. Each had direct supervision of all salesmen within that region and was in charge of hiring, firing and training these salesmen. Further, the Sales Manager assigned weekly duties and specific sales areas to the salesmen, who would then

report directly to him. Contacts between the home office and the salesmen were routed through the Sales Manager.

"12. Advertising of appellant's products was guided by the Sales Manager in his region. He developed radio advertising where it was needed most and chose the sites for billboard type advertising. The Sales Manager also recommended the type and amount of advertising to be employed. With the aid of his sales staff the Sales Manager kept constant surveillance on the sales of competitive brands within each region. He assigned his men to call on retailers for the purpose of selling new packages on behalf of the local distributor. Constant watch was kept to assure that appellant's products were fresh when sold by the distributor and the retailer.

"13. Regional sales meetings were conducted at least annually in each region. These were arranged and presided over by the Sales Manager. They were attended by all the salesmen of appellant assigned to the particular region together with all the distributors in the area who dealt with appellant.

"14. In the event any distributor became delinquent in his account, the Sales Manager handled the collection which, when necessary, included retaining counsel.

"15. All salesmen of appellant advised the distributors on freight rates. They sought out the most favorable rates and, on occasion, arranged pool car shipments to reduce freight charges to the distributor.

"16. Each Sales Manager maintained an office in his home equipped with a typewriter, adding machine, desk, file cabinets, telephone, memo pads, order forms and other general office equipment. Business conducted from the home included telephone sales and contacts with distributors; telephone contacts with District Sales Supervisors and the home office; preparation of promotional plans; answering of correspondence; preparation of reports and other general work. Out of a 45-hour work week, the Sales Manager spent from 13 to 15 hours working in his home. Each Sales Manager had a business card listing Grain Belt

Breweries, Inc., his name and title and the address and telephone number of his office.

"17. The salesmen received their weekly work assignment from the Sales Manager. Typically, their duties would include checking competitor's sales and programs and reporting to the Sales Manager on the need for specific promotions; selling new and additional products to a distributor; assisting the distributor's salesmen to sell appellant's products to the retail accounts, obtaining orders from retailers for distributor's account; placing advertising and displays in retail outlets; checking the distributor's inventory to insure freshness of the beer; and insuring that appellant got a fair share of the distributor's sales efforts.

"18. All of the Regional Sales Managers and all of the District Sales Supervisors were salaried. None of them was hired on a commission basis. The appellant supplied the District Sales Supervisors and the Regional Sales Managers with miscellaneous office supplies, paid long distance phone calls for them, paid all of their travel expenses, in addition to a monthly salary. Appellant did not pay rent for the use of part of their home as office space and provided no furniture for said offices.

"19. Nearly all orders were prepared by the distributors themselves, who were independent contractors, and were sent directly to the Minneapolis office or to the Omaha office for processing. Almost none of the orders ever went through the office of the Sales Supervisor or the Regional Sales Managers. Occasionally the Sales Supervisor helped the distributors make shipping arrangements but this was not part of their normal function.

"20. Most of the time of the Sales Representatives and the Sales Managers was spent on work in retail outlets with the distributors, placing advertising and getting new distributors for Grain Belt. Their primary function was to gain more sales for Grain Belt in the territory covered by them."

The issue presented is whether the sales to out-of-state beer distributors should have been excluded in computing the com-

pany's Minnesota income tax. The specific statute involved is Minn. St. 1971, § 290.19, subd. 1(4), which provided:

"For the purposes of this section, in determining the amount of sales made within Minnesota, there shall be excluded therefrom sales negotiated or effected in behalf of the taxpayer by agents or agencies chiefly situated at, connected with, or sent out from premises for the transaction of business owned or rented by the taxpayer or by his agents or agencies outside the state and sales otherwise determined by the commissioner to be attributable to the business conducted on such premises."[1]

The question is whether the activities of Grain Belt's regional sales managers and district supervisors constitute negotiating or effecting sales so that those sales can be excluded in computing the ratio of sales within Minnesota to total sales. The fact that according to the Minnesota Commercial Code, Minn. St. 336.2—401, title to these goods passes in Minnesota, and thus the sales are formally executed in this state, is not determinative. Ralston Purina Co. v. Commr. of Revenue, 306 Minn. 321, 236 N. W. 2d 779 (1975), therefore, is not directly in point because that case involved sales solicited in the taxing state.[2] The Maytag Co. v. Commr. of Taxation, 218 Minn. 460, 464, 17 N. W. 2d 37, 40 (1944), also is inapposite because it involved whether certain sales were made "through, from, or by offices, agencies, branches, or stores" within the taxing state. The present case does not involve sales solicited in another state. The question here is whether, in the absence of such solicitation, the activities of

---

[1] This section was deleted effective January 1, 1974. L. 1973, c. 650, art. VII, § 2.

[2] We said in the Ralston Purina case: "What is inescapable about the disputed sales is that Minnesota brokers called on Minnesota customers to solicit their orders, the customers placed their orders in Minnesota, the goods were shipped to the customers in Minnesota, and the customers received their invoices in and made their payments from Minnesota." 306 Minn. 325, 236 N. W. 2d 782.

Grain Belt's regional sales managers and district supervisors constitute "negotiating or effecting" sales.

Minnesota case law is not a helpful guide on the specific issue of this case. Most of the cases cited by appellant do not involve the issue here.[3] For example, in Tonka Corp. v. Commr. of Taxation, 284 Minn. 185, 169 N. W. 2d 589 (1969), this court held that a Minnesota company's sales had a tax situs in New York because of the activities of an out-of-state agent who solicited orders, pooled shipments, and promoted the company's product. The case is inapposite, however, in that the issue in that case was whether the agent was an independent contractor or an employee for purposes of computing the company's state income tax. The case did not discuss the definition of "negotiating or effecting" sales.[4]

Appellant refers to a definition of negotiation used by the Kentucky Supreme Court in Allphin v. Glenmore Distilleries Co. 270 S. W. 2d 168, 169 (Ky. 1954):

"We concur in the view expressed in the cases above cited that the word 'negotiated,' as used in the allocation statute, has reference to the activities that induced, brought about or created the sale, rather than to the steps involved in consummating or completing the sale transaction."

Appellant overlooks the fact, however, that the Allphin case, like

---

[3] State v. Northwestern States Portland Cement Co. 250 Minn. 32, 84 N. W. 2d 373 (1957), cited by appellant, involved whether the company conducted enough business in Minnesota so that this state had jurisdiction to impose a tax. The court did not determine which activities constitute negotiating or effecting a sale. Cheney Brothers Co. v. Commonwealth of Massachusetts, 246 U. S. 147, 38 S. Ct. 295, 62 L. ed. 632 (1918), also involved the question of whether a state had jurisdiction to impose a tax. The settlement in LaMaur, Inc. v. Commr. of Taxation, Minn. Tax Ct. Docket Nos. 1565 to 1567 (1972), is not of precedential value.

[4] The Tonka holding was limited to its facts by this court in E. F. Johnson Co. v. Commr. of Taxation, 302 Minn. 236, 224 N. W. 2d 150 (1974).

the Maytag and Tonka cases, involved salesmen who actually solicited orders.

The most apt statement of the law on this question was made by the Pennsylvania Supreme Court in analyzing the meaning of "negotiating or effecting" sales:

"* * * [I]f the technique of selling presented involves an initial customer contact, a subsequent approval of the customer and placement of him on the seller's list of customers, and continued placement of orders by the customer directly to a distribution center of the seller, a careful analysis must be made to discern where the significant selling actions occur. The initial contacts between customer and seller may actually involve the negotiation and effectuation of a long-continued series of sales if these contacts actually involve an agreement to buy and sell. Where, however, only a status (e. g., approved customer) is determined, it is clear that no sale is made; and subsequent events must be scrutinized. Somewhere in the relationship of buyer and seller something happens which brings about a sale; when it does, an allocable event occurs." Commonwealth v. General Foods Corp. 429 Pa. 266, 280, 239 A. 2d 359, 367 (1968).

To find that the activities of Grain Belt's regional managers were material economic factors in making the sales in question would go too far since it would allow a company to allege that its sales were effectuated out of state because some activities of its employees could be found to enhance out-of-state business. The activities of the employees involved here are neither specifically designed to induce sales nor are they the type of activity customarily centered at a sales office. Their activities may be likened to an advertising agency's campaign to enhance general public demand for a product. It could not be said, however, that the advertising agency has "negotiated or effected" each sale within the reach of its advertising.

In this case it must be remembered that virtually all the orders were submitted directly from customers to the Minneapolis of-

fice and were filled without any intervention, solicitation, or negotiation by the sales managers or supervisors. They were either accepted or rejected at the home office. The Tax Court in its memorandum stated:

"The activity of the Sales Representative and Sales Manager was not the chief element which generated the sale. The activities of the so-called 'salesmen' were more in the nature of sales management and quality control. They were directed from the Minneapolis office, paid by the Minneapolis office, but did not make the actual, final sale. There is no doubt that the activities of the Sales Representatives increased the number and amount of sales produced in the area assigned to them, but we cannot find that the sales were 'negotiated or effected' by the Sales Representatives."

Had salesmen solicited the actual orders and processed them, as they did in the Ralston and Maytag cases, we probably would have arrived at the opposite conclusion in this case. In the absence of actual solicitation of orders, we hold that the activities of the regional managers here do not have a sufficiently direct relationship to sales to constitute negotiating or effecting sales. Therefore, we find that the determinations of the Tax Court are amply sustained by the evidence.

Affirmed.